UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
NORTHROCK MANAGEMENT LLC,
f/k/a NORTHROCK MINERALS LLC,

             *Plaintiff/Counterclaim-Defendant*,

    – against –

JOSEPH COHEN and SNOW JOE LLC,

             *Defendants/Counterclaim-Plaintiffs*.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
SNOW JOE LLC,

             *Third-Party Plaintiff*,

    – against –

MOSHE WECHSLER,

             *Third-Party Defendant*.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Case No. 24-cv-3155 (JSR)

**THIRD-PARTY COMPLAINT**

      Defendant/Counterclaim-Plaintiff/Third-Party Plaintiff Snow Joe LLC ("Snow Joe" or "Third-Party Plaintiff"), by and through its attorneys, Judd Burstein, P.C., as and for its Third-Party Complaint against Third-Party Defendant Moshe Wechsler ("Wechsler" or "Third-Party Defendant"), alleges as follows:

**NATURE OF THE CASE**

      1.    This Third-Party Complaint arises out of a complicated fraud and brazen breaches of contract perpetrated by Wechsler and Plaintiff/Counterclaim-Defendant Northrock Management LLC, f/k/a Northrock Minerals LLC ("Plaintiff" or "Northrock"). While the fraud was complicated, the purpose of the scheme was straightforward:  (a) to induce Snow Joe to purchase Northrock's assets (the "Northrock Assets") relating to its wholesale ice melt business for millions of dollars, and (b) while not directly relevant to the relief sought herein, to get

Defendant/Counterclaim-Plaintiff Joseph Cohen ("Cohen") to personally guarantee Snow Joe's financial obligations.

2.      Wechsler and Northrock, however, had no intention of allowing Snow Joe to enjoy the benefit of its bargain.  Instead, in violation of various representations, warranties, and contracts -- including a Non-Compete Agreement -- Northrock immediately reacquired the most valuable assets it purportedly sold to Snow Joe.  A true and accurate copy of the August 24, 2022 non-compete agreement ("Non-Compete Agreement"), signed by Wechsler in his personal capacity, is annexed hereto as Exhibit 1 and incorporated herein by reference.

3.      As alleged herein, Wechsler made multiple material, knowingly false representations to induce Snow Joe to agree to pay millions of dollars to purchase the Northrock Assets.

4.      Snow Joe reasonably relied on these fraudulent representations to its detriment by paying some $6.5 million for assets it either did not receive or which were egregiously substandard. Now, however, Northrock and, through it, Wechsler are wrongfully enjoying the benefit of the bargain that Northrock ostensibly conveyed to Snow Joe.

5.      Nonetheless, Wechsler and Northrock were not content with having defrauded Snow Joe out of millions of dollars.  Instead, Northrock is suing Snow Joe for millions of dollars more while seeking to hold Cohen personally liable on his guarantees.

6.      Wechsler's competition with Snow Joe is in direct violation of a Non-Compete Agreement that he signed in his personal capacity.  Wechsler, through Northrock, is also competing against Snow Joe using a trademark that is misleadingly similar to one that it sold to Snow Joe, and which it registered on behalf of a non-existent corporation to conceal Wechsler's

breaches of the Non-Compete Agreement.  Hence, the Court should issue an injunction preventing Weschler's continued further violations.

**PARTIES**

7.      Snow Joe is a Limited Liability Company organized under the laws of New York State.  Cohen is its sole member.  Cohen is a citizen of the State of New York.

8.      Upon information and belief, Wechsler is a citizen of the State of Florida.

**JURISDICTION AND VENUE**

9.      The Court has jurisdiction over this dispute pursuant to 28 U.S.C § 1332(a) because (a) Snow Joe is a citizen of New York, (b) upon information and belief, Wechsler is a citizen of Florida, and (c) the amount in controversy exceeds $75,000.

10.      Venue is proper in this district because Snow Joe's claims principally arise out of a Non-Compete Agreement between it and Wechsler that contains a forum selection clause which provides that "[a]ny action or proceeding by either Party to enforce this Agreement shall be brought only in any state or federal court located in the State of New York, County of New York." Exhibit 1 hereto at § 5.

**FACTS RELEVANT TO ALL CLAIMS**

11.      Upon information and belief, Wechsler was the sole member and manager of Northrock for all times relevant hereto.  This information and belief is based, in part, upon Northrock's express representation that Wechsler was Northrock's sole member and manager. *See, e.g.*, Exhibit 2 hereto at § 2.5(b)(iii), an August 3, 2022 Asset Purchase Agreement ("Asset Purchase Agreement"), entered into between Snow Joe and Northrock which is incorporated by reference.  Specifically, Section 2.5(b)(iii) of the Asset Purchase Agreement refers to Northrock's

3

"sole member and manager," and the contract itself was signed by Wechsler as Manager and CEO. *Id.*, at the signature page.[1]

12.    In the late spring to early summer of 2022, Cohen and Wechsler had discussions during which Wechsler advised Cohen that Northrock was interested in selling all of its assets.

13.    During these discussions, Wechsler represented to Cohen and Snow Joe that Northrock was a wholesale supplier of ice melt that had valuable supply agreements and a long-standing relationship with Home Depot, Inc. ("Home Depot") (the "Home Depot Commitment"). Wechsler further told Cohen and Snow Joe that Northrock had obtained the bulk of its business from Barry Wachsler's ("Barry Wachsler")[2] business, Dart Seasonal Products, Inc. ("Dart"), which had been involved in the wholesale ice melt supply business for many years.

14.    During these same discussions, Wechsler described Barry Wachsler as the founder and principal of Dart.  Wechsler, however, advised Cohen and Snow Joe that Barry Wachsler was now employed by Northrock as its Chief Sales Director.

15.    As per Wechsler, he (Wechsler) was the only person Cohen needed to speak with to negotiate a purchase of the Northrock Assets.

16.    The means by which Northrock obtained Dart's assets is peculiarly within the knowledge of their principals, Wechsler and Barry Wachsler.  Nevertheless, upon information and

---

[1]    Northrock has also alleged that it is a limited liability company with its principal place of business located at 777 Chestnut Ridge Road, Chestnut Ridge, New York 10977.  *See* Northrock's Amended Complaint ("Amended Complaint"), Dkt. No. 14, at ¶ 5.  Northrock further alleges that it amended its Articles of Organization to change its name from Northrock Minerals to Northrock Management LLC on September 6, 2022.  *Id.*, at ¶ 6.  Snow Joe lacks knowledge or information sufficient to form a belief as to the truth of those allegations.

[2]    We have defined Barry Wachsler with his full name to avoid confusion due to the similarity between his and Wechsler's last names.

belief, it involved a $4 million judgment entered against Barry Wachsler and Dart in the litigation *Emerald Interest LLC v. Dart Seasonal Products*, *Inc., et al.*, Index No. 153019/2019 (Sup. Ct. N.Y. Cty) (the "*Emerald Interest* Litigation").

17.     The original plaintiff in the *Emerald Interest* Litigation was Gerber Finance Inc. ("Gerber").

18.     However, on February 13, 2020, the Court in the *Emerald Interest* Litigation "So Ordered" a stipulation substituting Emerald Interest LLC ("Emerald Interest") for Gerber as the plaintiff.

19.     Upon information and belief, Wechsler controls Emerald Interest.  This information and belief is based in part upon the facts that (a) Wechsler is associated with multiple entities with the word "Emerald" in their names, and (b) the New York State Department of State ("NYSDOS") records show that Emerald Interest has the exact same address of 777 Chestnut Ridge Road, Suite 301, Chestnut Ridge, New York 10977, as Northrock and other entities associated with Wechsler.

20.     On December 22, 2020, the Court in the *Emerald Interest* Litigation entered a $4,000,000 consent judgment in favor of Emerald Interest against Barry Wachsler and Dart.  As of the date of this filing, the docket in the *Emerald Interest* Litigation does not contain a satisfaction of judgment.

21.     Upon information and belief based upon these facts and others alleged *infra*, Wechsler and Barry Wachsler reached a clandestine agreement whereby Dart transferred its assets to Northrock in exchange for relief from the $4 million judgment entered against Dart and Barry Wachsler in favor of Emerald Interest.

22.     In addition to the foregoing allegations, this information and belief is based in part upon the following:

<ol type="a" start="1">
<li>Northrock assumed Dart's name on December 9, 2020, as reflected in the records of the NYSDOS;</li>
<li>A mere 13 days later, on December 22, 2020, Dart and Barry Wachsler consented to the entry of the $4 million judgment against them;</li>
<li>Wechsler told Cohen that Northrock had obtained Dart's assets; and</li>
<li>As alleged in more detail <em>infra</em>, the Asset Purchase Agreement states that Northrock is identified as "Dart" in a communication from Home Depot confirming the Home Depot Commitment which Northrock agreed to sell to Snow Joe pursuant to that contract.</li>
</ol>

23. In the summer of 2022, unaware of these events, Cohen agreed in principle with Wechsler that Snow Joe would purchase the Northrock Assets, including its intellectual property, and, most importantly, the Home Depot Commitment.

24. Leading up to this agreement in principle, Wechsler represented to Cohen and Snow Joe on multiple occasions that (a) Wechsler and Northrock were exiting the ice melt business and would not compete with Snow Joe in selling ice melt to Home Depot or any purchaser of ice melt, (b) Northrock had the right and was willing to validly convey the Home Depot Commitment to Snow Joe, and (c) neither Wechsler nor Northrock had any agreements or understanding whatsoever about the assets which it was transferring to Snow Joe.

25. Wechsler made these representations during multiple discussions, both over video conferences and on the telephone, beginning in late April of 2022, and continuing from time to time until the written agreements were executed. Wechsler also made the same representations during an in-person meeting on July 11, 2022.

26.     During these discussions, Wechsler stated that his primary business interests were in real estate and that the ice melt business had become a distraction to him.  Wechsler stated on multiple occasions that he wanted to cut all ties to the ice melt business to focus on real estate. Wechsler further represented to Snow Joe and Cohen that because he was exiting the ice melt business, Snow Joe would be free to enjoy the benefit of the Home Depot Commitment without competition from Northrock or any other entity in which Wechsler had an interest.

27.     Upon information and belief based on the events alleged herein, Wechsler knew that these representations were false when made.

28.     In particular, Wechsler's claim that he wanted to exit the ice melt business because he was too busy with real estate is belied by the web of companies that, on information and belief, he created to continue selling ice melt.  In this regard, there are no less than nine different New York and New Jersey entities with "Northrock" in their name.[3]  On information and belief, these Northrock entities are controlled by Wechsler and are involved in the ice melt business.

29.     Upon further information and belief, Wechsler would not have gone to the trouble of creating so many different Northrock entities if the ice melt business was merely a distraction from his real estate dealings.  Upon further information and belief, there was no legitimate business purpose for Wechsler to create so many different "Northrock" entities other than to continue selling ice melt.

---

[3]     In addition to Plaintiff, *see* (a) Northrock Ventures, LLC, NJ Department of the Treasury ("NJDOT"), Division of Revenue and Enterprise Services, Entity ID 0450382064, (b) Northrock 1 LLC, NYSDOS DOS ID # 5129047, (c) Northrock 2 LLC, NYSDOS DOS ID # 5129691, (d) Northrock Minerals 2 LLC, NJDOT Entity ID 0450876758, (e) Northrock Production, LLC, NJDOT Entity ID 0450589717, (f) Northrock Production LLC, NYSDOS DOS ID # 5910786, (g) Northrock Management, LLC, NJDOT Entity ID 0450589756, and (h) "Northrock Salt Corp," NJDOT Entity ID 0450036260.

30.    In all events, Snow Joe and Northrock effectuated the sale through a series of agreements including, but not limited to, (a) the Asset Purchase Agreement, (b) the Non-Compete Agreement, and (c) an August 24, 2022 assignment of Northrock's Trademarks ("Trademark Assignment").  Exhibit 3 hereto is a true and accurate copy of the Trademark Assignment, which is incorporated herein by reference.

31.    These contracts contained various protections and warranties that Snow Joe had insisted upon in order to ensure that it received the benefit of its bargain.  *See id. passim*.  For example, the Asset Purchase Agreement contained the following warranties:

      a.    Neither Seller[4] nor any of its Affiliates has any agreement, absolute or contingent, written or oral, with any other Person to effect any acquisition transaction or to sell or otherwise transfer any of the Purchased Assets and there are no outstanding options or commitments to which Seller is a party which relate to sale of the Purchased Assets (Exhibit 2 hereto at § 3.4); and

      b.    There are no understandings of any nature between Seller and any member or affiliate related to the Purchased Assets.  *Id.*, at § 3.8.

32.    As Northrock's sole manager and member, who admitted that he would personally benefit from Snow Joe's acquisition of the Northrock Assets (*see* Exhibit 1 at p. 1, the fourth "WHEREAS" clause), and who further negotiated the sale of the Northrock Assets, Wechsler personally participated in the false warranties contained in the Asset Purchase Agreement.

33.    The Asset Purchase Agreement further defined "Ancillary Agreements" to include the Non-Compete Agreement, and Section 3.2 of the Asset Purchase Agreement provides that

---

[4]    Defined terms from the Asset Purchase Agreement are used herein.

"[t]his Agreement … and each Ancillary Agreement … constitute a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms…."  Exhibit 2 hereto.

34.    As the "Key Employee" identified in the Non-Compete Agreement, Wechsler covenanted not to compete with Snow Joe in the ice melt business throughout the territory of North America for a period of three (3) consecutive years from the date when Snow Joe acquired the Northrock Assets.  Exhibit 1 hereto at § 1.  In particular, Wechsler is barred from contributing his "knowledge, directly or indirectly, in whole or in part, as an employee, owner, operator, manager, advisor, consultant, contractor, agent, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity" in the business of manufacturing, marketing, and selling ice melt.  *Id.*

35.    Upon information and belief based on subsequent events as alleged herein, Wechsler knew that these warranties were false when made.

36.    Section 6.5 of the Asset Purchase Agreement contains a broadly worded integration clause providing that it and the Ancillary Agreements contain "the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, with respect to such matters."  Exhibit 2 hereto.

37.    This integration clause did not prevent Snow Joe from reasonably relying upon the warranties contained in the Asset Purchase Agreement itself, because they are included in the same contract as the integration clause.  This integration clause similarly did not prevent Snow Joe from reasonably relying upon the warranties contained in the Non-Compete Agreement, because it is an Ancillary Agreement that is included in "the entire agreement among the Parties" under the Asset Purchase Agreement.  Exhibit 2 hereto at § 6.5.  Nor does the integration clause specifically

disclaim reliance upon Wechsler's oral misrepresentations that preceded the parties' entering into the Asset Purchase Agreement.

38.    The principal business reason that Snow Joe agreed to purchase the Northrock Assets was to obtain the Home Depot Commitment free from competition by Wechsler and/or Northrock.

39.    The significance of the Home Depot Commitment is reflected in Section 3.14 of the Asset Purchase Agreement, entitled "Validity of Home Depot Orders," which provides in relevant part: "The following commitment from The Home Depot, Inc. and its affiliates to the Seller (identified as 'Dart' in the below) is correct and complete.  For the avoidance of doubt, this representation and warranty is a material provision of this Agreement and **the invalidity of the purchase order shall constitute a material breach of the Agreement**."  Exhibit 2 hereto (Emphasis supplied).

40.    Section 3.14 of the Asset Purchase Agreement further states that the Seller (Northrock) was "identified as 'Dart'" in a communication from Home Depot that confirmed the Home Depot Commitment.  *Id.*

41.    As alleged above, Dart was a New York corporation with ties to Barry Wachsler. However, based on the records of the NYSDOS, Northrock assumed the name of Dart Seasonal Products on December 9, 2020.  Accordingly, upon information and belief, the "Dart" referred to in the Home Depot communication was Northrock by its assumed name.

42.    Section 3.14 of the Asset Purchase Agreement proceeds to include a portion of a communication from Home Depot containing details of market "sku awards for 2022-2023."  *Id.* The Home Depot communication included in Section 3.14 was addressed to "Barry," who, upon

information and belief, is Barry Wachsler.  *Id.*  This information and belief is based in part upon the fact that Northrock represented to Snow Joe that Barry Wachsler was its Chief Sales Director.

43.    That Home Depot was writing Barry Wachsler to confirm its commitment to purchase large quantities of ice melt from Dart -- which were the same purchase orders that Northrock was ostensibly selling to Snow Joe -- evidences the connection between Dart, Wachsler, and the Northrock/Snow Joe transaction.

44.    Home Depot organizes its stores by region which are given a market number, and the Home Depot Commitment included "Market 15."  Home Depot's Market 15 contains 62 stores, approximately half of which are located in the northern New Jersey/New York Metro area (the "Market 15 NJ/NY Metro Stores").  These Market 15 NJ/NY Metro Stores were the most valuable component of the Home Depot Commitment because they are located in high population density areas.

45.    In addition to Market 15, the Home Depot Commitment contained Markets 20, 65, 68, 202, 373, 374, 479, and 503, with stores located in Pennsylvania, Manhattan, and Long Island.  While these ice melt markets had value, their financial significance was dwarfed by the Market 15 NJ/NY Metro Stores.

46.    The purchase price for the Northrock business was $8,900,000 with some additional inventory to be obtained at Northrock's cost.

47.    In good faith reliance upon Wechsler and Northrock's representations as alleged above, Snow Joe paid Northrock (a) a $1,000,000 deposit upon execution of the Asset Purchase Agreement on August 3, 2022, and (b) an additional $3,400,000 at the closing of the Asset Purchase Agreement on August 24, 2022.

48.    Beginning in August of 2022, almost immediately after the closing under the Asset Purchase Agreement, Northrock --- with Wechsler's active and personal participation -- disrupted Snow Joe's ability to integrate the Northrock Assets into its business in the following ways:

49.    **First**, Wechsler and Northrock refused to transfer Northrock's Home Depot vendor number to Snow Joe.  Without Northrock's vendor number, Snow Joe could not even begin to receive -- let alone fill -- the Home Depot purchase orders it paid for under the Asset Purchase Agreement.  This timing of the transfer was critical, because the snow melt supply season begins in September.

50.    By unreasonably delaying Snow Joe's ability to receive and fill its Home Depot purchase orders, Wechsler and Northrock deprived Snow Joe of valuable cash flow at the start of the 2022-23 season.  At a minimum, if Snow Joe had been provided with the purchase orders from Home Depot, it could have borrowed additional funds to purchase materials and meet other expenses to satisfy its supply obligations as the season progressed.  Wechsler and Northrock, however, ensured that this would be impossible by delaying Snow Joe's receipt of the Home Depot purchase orders.

51.    Far worse, Wechsler and Northrock's delay in providing Snow Joe with Northrock's Home Depot vendor number prevented Snow Joe from filling Home Depot's initial ice melt purchase orders on Home Depot's desired timetable.  This delay -- which was a direct result of Wechsler and Northrock's refusal to transfer its vendor number -- created a strain in Snow Joe's relationship with Home Depot when it initially began supplying the Home Depot Commitment.

52.    Indeed, Northrock did not give Snow Joe control over its vendor number until September 8, 2022, which was **after** Home Depot had wanted to receive its initial deliveries.

53.    **Second**, Wechsler and Northrock failed to transfer to Snow Joe the Northrock.com website, which was crucial for advertising and promoting the purchased brands.  It was only after extensive delay and numerous complaints by Snow Joe that Northrock made the transfer.

54.    Moreover, shortly after Northrock transferred the Northrock.com website to Snow Joe, it experienced technical difficulties that required cooperation from Northrock to resolve. Despite Snow Joe's repeated requests to Wechsler, Northrock failed to provide timely assistance with the problem.

55.    **Third**, "Dart ice melt" was another brand that Snow Joe purchased from Northrock. Nevertheless, Wechsler and Northrock refused to transfer the "Dartsp.com" website to Snow Joe, which it also needed to advertise and promote the purchased brands.  When Snow Joe asked Wechsler to provide it, he stalled for over a month and then claimed that Northock did not have access to it.  This assertion was completely inconsistent with Wechsler's prior representations that Northrock had purchased Dart's assets.

56.    **Fourth**, Wechsler and Northrock withheld other key assets sold to Snow Joe, including product images, videos, catalogues, and Toll Free and other valuable telephone numbers.

57.    **Fifth**, and most significantly, Wechsler and Northrock delayed providing crucial inventory that Snow Joe was entitled to pursuant to the parties' contracts.  Some of this inventory was included in the purchase price, and other inventory was to be acquired at Northrock's cost.

58.    Snow Joe needed this inventory to fill orders from Northrock's former customers, including Home Depot.  A major component of this inventory -- calcium chloride -- is a fundamental component of certain ice melts.  Wechsler represented during the parties' negotiations that Northrock would be receiving a large shipment of calcium chloride from a supplier in Egypt

(the "Egypt Shipment") before the end of summer of 2022, and that it would be available for Snow Joe to use during the 2022-23 season.

59.     Upon information and belief, this representation was false as shown in part by the fact that the Egypt Shipment did not even arrive at the port in New Jersey until late October of 2022, and Northrock did not make the calcium chloride available to Snow Joe until mid-November of 2022.

60.     Northrock's failure to timely deliver the Egypt Shipment's calcium chloride prevented Snow Joe from making deliveries to Home Depot of certain ice melt products until late November into early December of 2022.  However, as Wechsler knew, Home Depot had requested delivery of initial shipments of ice melt starting in September that year.

61.     Snow Joe's delays of its shipments to Home Depot (which were caused by Wechsler and Northrock's delays) further strained Snow Joe's relationship with the giant retailer. Upon information and belief, Wechsler intentionally delayed Northrock's deliveries to sabotage Snow Joe's relationship with Home Depot.

62.     Faced with these cash flow and inventory problems caused by Wechsler and Northrock, on or about November 14, 2022, Snow Joe and Cohen entered into the Payment Agreement with Northrock.[5]

63.     The Payment Agreement provides that out of $1,260,661.71 to be paid by Snow Joe, $720.793.67 was to reimburse Northrock for an "Allied Salt – contract deposit."  An additional

---

[5]     Based upon Northrock's allegations, at the time it entered into the Payment Agreement on or about November 14, 2022, it had already changed its name to Northrock Management. Nevertheless, Northrock signed the Payment Agreement as "Northrock Minerals."

$417,762.76 payable under the Payment Agreement was allocated for "Empty Roll Stock Bags." Dkt. No. 14-3, Exhibit 3 to the Amended Complaint, at p. 13.

64.    Prior to the execution of the Payment Agreement, Northrock represented that (a) the Allied Salt contract deposit entry constituted a deposit that Northrock had paid for raw materials for ice melt, while (b) it had purchased the Empty Role Stock Bags to package the finished product for ultimate sale to the consumer.

65.    In sum and substance, as per Wechsler, Northrock was providing Snow Joe with the raw materials and packaging for a portion of the ice melt that Northrock would have used for the 2022-23 season absent a sale of its assets.

66.    In addition to the delays alleged above, a significant portion of the product that Northrock did provide to Snow Joe under the Asset Purchase Agreement and the Payment Agreement was egregiously substandard.  Specifically, the calcium chloride was hardened and numerous branded bags for sale to the consumer were broken while others were discolored from extensive exposure to the elements.  Consequently, a substantial percentage of the Northrock inventory was completely unsellable.

67.    The poor quality of Northrock's inventory created problems for Snow Joe with its customers.  Snow Joe received numerous complaints that Northrock's bags of ice melt were hardened "like brick," among other problems.  Consequently, Snow Joe was forced to devote time and resources to assist customers in finding replacements.

68.    Section 3.12 of the Asset Purchase Agreement contains a warranty that the inventory which Northrock was selling to Snow Joe was in "current, good, saleable and marketable condition."  Exhibit 2 hereto.  Much of it was not.  In contrast to Section 3.12's warranties, Section 2.7 of the Asset Purchase Agreement provides that Snow Joe is purchasing the inventory "as is"

without warranties and it had an opportunity to inspect. *Id.* Accordingly, there is a conflict between these two provisions of the Asset Purchase Agreement. Moreover, the assertion that Snow Joe had an opportunity to inspect the inventory is indisputably factually inaccurate because a significant portion of it was in transit and unavailable to inspect.

69.    On February 21, 2023, Snow Joe had what is called a line review with Home Depot in anticipation of the 2023-24 ice melt season. Consistent with Home Depot's practice, during the line review Snow Joe made a supply presentation for the 2023-24 ice melt season as to items, pricing, shipping configurations, etc. However, the key component of the line review is pricing and Snow Joe committed to keep its pricing consistent with the 2022-23 season.

70.    Thereafter, on or about April 3, 2023, Home Depot released the store awards for the 2023-23 season to its ice melt suppliers. This timing is also consistent with Home Depot's practices, because its suppliers need advanced notice to prepare to meet their supply obligations.

71.    Upon review of the store awards for the 2023-24 ice melt season, Snow Joe learned that, contrary to Wechsler and Northrock's prior representations, it would not receive thirty-two (32) of the Market 15 stores for the 2023-24 season – essentially all of the Market 15 NJ/NY Metro Stores. This was devastating news for Snow Joe, because it lost what was by far the most valuable component of the Home Depot Commitment.

72.    Home Depot of course had the right to change suppliers following the 2022-23 season. However, Wechsler and Northrock did not have the right to solicit and obtain Home Depot's business. As it turned out, that is exactly what they did.

73.    On October 10, 2023, Snow Joe received an ice melt report from Home Depot which showed that a company identified as "Blue Mineral" had replaced Snow Joe as the supplier for the most valuable Home Depot Market 15 stores.

74.     Upon information and belief, the "Blue Mineral" referenced in Home Depot's ice melt report store awards is Northrock.  This information and belief is based in part upon the NYSDOS records which show that Northrock adopted "Blue Minerals" as an assumed name on December 9, 2020.

75.     Hence, upon information and belief, Wechsler and Northrock (a) are competing with Snow Joe under the Blue Minerals assumed name, and indeed (b) acquired the same Market 15 NJ/NY Metro Stores one season after Northrock purported to sell the right to supply them to Snow Joe, and Wechsler and Northrock agreed not to compete.

76.     In addition to undermining Snow Joe's relationship with Home Depot from the very beginning, upon information and belief, Wechsler and Northrock also undercut Snow Joe on the price of the ice melt for the Market 15 NJ/NY Metro Stores.  Upon information and belief, Northrock was able to undercut Snow Joe on price because Wechsler had knowledge of the prices Northrock charged in the purchase orders which it had sold to Snow Joe for the 2023-24 season, and Northrock had excess cash flow by reason of the $6.5 million which Snow Joe had paid to Northrock.

77.     Conversely, Snow Joe was at a competitive disadvantage against Northrock in terms of pricing because of the cash flow limitations created by the monies it had paid to Northrock.

78.     Even more outrageously, for the purpose of confusing Home Depot and its customers, Northrock (under the assumed name Blue Mineral) is selling ice melt to Home Depot using a product name that is deceptively similar to a trademark which Northrock assigned to Snow Joe.

79.    More specifically, one of the trademarks that Northrock assigned to Snow Joe under the Trademark Assignment is "Blue **Heat** Snow and Ice Melter" ("Blue Heat").  Exhibit 3 hereto at Schedule A (Emphasis supplied).  However, Blue Mineral -- in reality, upon information and belief, Northrock -- is selling a competing product to Home Depot under the name of "Blue **Fire** Snow and Ice Melter" ("Blue Fire").  (Emphasis supplied).

80.    The only difference between the two names is the use of the word "Fire" instead of "Heat."  Indeed, the names are so similar that, on June 5, 2024, the United States Patent and Trademark Office ("USPTO") issued a Non-Final Office Ruling denying an application for a trademark for Blue Fire because of the likely confusion with the Blue Heat trademark.

81.    It is clear that Wechsler and Northrock are behind the deceptive sales of Blue Fire for the following reasons:

82.    The USPTO's website reflects that on October 4, 2023, Barry Wachsler filed a trademark application on behalf of the New York Corporation "Blue Mineral Corporation" for the mark "Blue Fire Snow and Ice Melter."  However, upon information and belief, there is no such New York corporation.  This information and belief is based in part upon the fact that the NYSDOS database contains no record of any corporation or other entity named "Blue Mineral Corporation."

83.    Instead, the only New York entity with Blue Mineral in its name is Blue Mineral LLC, which on information and belief, is controlled by Wechsler.

84.    This information and belief is based in part upon the fact that the NYSDOS records identify Wechsler as Blue Mineral's agent for service of process at 777 Chestnut Ridge Road, Suite 301, Spring Valley, New York 10977.  This is the same address (a) given in the Asset Purchase Agreement and other contracts for service of notice upon Northrock, and (b) reflected in the NYSDOS records as the address for Emerald Interest.

85.     Nevertheless, upon information and belief, the Blue Mineral selling Blue Fire is Northrock under its assumed name (as registered with the NYSDOS), and not Blue Mineral LLC. This information and belief is based upon the fact that the NYSDOS records show Blue Mineral LLC's statement status as being past due since November 30, 2021.

86.     In all events, upon information and belief, Barry Wachsler intentionally misrepresented to the USPTO that the applicant for the Blue Fire trademark was the non-existent New York corporation Blue Mineral Corporation, when he instead procured the mark for the benefit of Northrock.

87.     This information and belief is based upon several facts, including (a) the similarity between the names "Blue Mineral" and "Blue Mineral Corporation," (b) there is no New York entity named "Blue Mineral Corporation," (c) the connections between Barry Wachsler, Dart, and Northrock, (d) the fact that, per Wechsler, Barry Wachsler had been employed as Northrock's Chief Sales Director, and (e) if Barry Wachsler had filed the "Blue Fire Snow and Ice Melter" trademark application on behalf of Northrock, he would have exposed Wechsler and Northrock to liability for breach of the Non-Compete Agreement.

88.     In this regard, Wechsler is barred for three (3) consecutive years throughout North America from competing with Snow Joe in the business of manufacturing, marketing, and selling ice melt.  Exhibit 1 hereto at § 1.

89.     Hence, if Barry Wachsler (or Wechsler) had filed an application for an existing entity, as opposed to the Blue Mineral Corporation, it would have vastly increased the chances that Snow Joe would discover that Wechsler was materially breaching the Non-Compete Agreement.

90.     Home Depot provides its ice melt suppliers with Ice Melt Reports which show sales by market, store, units, etc.  The Ice Melt Report that Home Depot provided to Snow Joe on or

about January 24, 2024, showed that as of mid to late January of 2024, Blue Mineral had already

sold more than 150,000 units of snow melt within the Market 15 NJ/NY Metro Stores.

## AS AND FOR A FIRST CLAIM FOR RELIEF

### (Breach of the Non-Compete Agreement)

91.    Third-Party Plaintiff repeats and realleges the foregoing allegations of the Third-

Party Complaint as if fully and completely restated herein.

92.    The Non-Compete Agreement is a valid contract.

93.    In the Non-Compete Agreement, Wechsler covenanted that for three years from

August 24, 2022, throughout the territory of North America, he would not contribute his

"knowledge, directly or indirectly, in whole or in part, as an employee, owner, operator, manager,

advisor, consultant, contractor, agent, partner, director, stockholder, officer, volunteer, intern, or

any other similar capacity to an entity in competition with" Snow Joe in the business of the

manufacturing, marketing, and selling of ice melt.  Exhibit 1 hereto at § 1.

94.    Wechsler breached the Non-Compete Agreement by competing with Snow Joe in

the business of manufacturing, marketing, and selling ice melt.

95.    Snow Joe performed its obligations under the Non-Compete Agreement prior to

Wechsler's material breach.

96.    Snow Joe has been damaged as a result of Wechsler's breach in an amount to be

determined at trial.

## AS AND FOR A SECOND CLAIM FOR RELIEF

### (Fraudulent Inducement)

97.    Third-Party Plaintiff repeats and realleges the foregoing allegations of the Third-

Party Complaint as if fully and completely restated herein.

98.     Prior to Snow Joe and Northrock entering into the Asset Purchase Agreement, the Promissory Note, and the Payment Agreement, Wechsler represented to Snow Joe that (a) he and Northrock were exiting the ice melt business and would not compete with Snow Joe, (b) Snow Joe would be free to enjoy the Home Depot Commitment, (c) Northrock had the right and was willing to validly convey the Home Depot Commitment to Snow Joe, and (d) neither Wechsler nor Northrock had any agreements or understanding whatsoever about its assets which were unencumbered and free to transfer.

99.     Upon information and belief based on the foregoing allegations, these representations were knowingly false when made.

100.     The broadly worded integration clause contained in Section 6.5 of the Asset Purchase Agreement does not bar consideration of Wechsler's fraudulent misrepresentations. *See* Exhibit 2 hereto.

101.     Certain of Wechsler's oral misrepresentations were memorialized in the Asset Purchase Agreement and the Non-Compete Agreement.

102.     In addition to Section 3.14 of the Asset Purchase Agreement which warranted the validity of the Home Depot purchase orders (Exhibit 2 hereto), Wechsler and Northrock further warranted that:

      a.     Wechsler would not compete with Snow Joe (Exhibit 1 hereto at § 1);

      b.     neither Seller nor any of its affiliates had any agreement to sell or otherwise transfer any of the Purchased Assets Section (Exhibit 2 hereto at § 3.4); and

      c.     that there are no understandings of any nature between Seller and any member or affiliate related to the Purchased Assets. *Id.*, at § 3.8.

103.     Wechsler signed the Non-Compete Agreement in his personal capacity and therefore personally made the misrepresentations contained therein.    Wechsler also personally participated in the inclusion of the false warranties contained in the Asset Purchase Agreement because (a) he made the same representations to Cohen and Snow Joe prior to the execution of the Asset Purchase Agreement, (b) Wechsler was Northrock's sole member and manager at the time Northrock entered into the Asset Purchase Agreement (Exhibit 2 hereto at § 2.5(b)(iii)), (c) Wechsler negotiated the sale of the Northrock Assets, and (d) Wechsler admitted that he personally benefitted from Snow Joe's acquisition of the Northrock Assets.  Exhibit 1 hereto at p. 1, the fourth "WHEREAS" clause.

104.     Upon information and belief that is based upon the foregoing allegations, Wechsler made these knowingly false representations and warranties to induce Snow Joe to enter into, *inter alia*, the Asset Purchase Agreement, the Payment Agreement, and the Promissory Note.

105.     Snow Joe reasonably relied on Wechsler's knowingly false representations to its detriment when, *inter alia*, (a) Snow Joe entered into the Asset Purchase Agreement, the Payment Agreement, and the Promissory Note, and (b) Snow Joe paid Northrock approximately $6.5 million.

106.     Snow Joe is entitled to damages against Wechsler in an amount to be determined at trial.  This relief is in the alternative to the rescission claim that Snow Joe asserted in its First Amended Answer with Counterclaims to the First Amended Complaint ("First Amended Answer with Counterclaims").  Dkt. No. 20 at Second Counterclaim.

## <u>AS AND FOR A THIRD CLAIM FOR RELIEF</u>

### (<u>Injunction</u>)

107.    Third-Party Plaintiff repeats and realleges the foregoing allegations of the Third-Party Complaint as if fully and completely restated herein.

108.    The Non-Compete Agreement provides that in the event of a breach, Wechsler "agrees that money damages would not afford an adequate remedy and that Snow Joe … shall be entitled to a temporary or permanent injunction … without the necessity of showing any actual damages, and without the necessity of posting a bond or any other security." Exhibit 1 hereto at § 3.

109.    As confirmed by this acknowledgment, the injury to Snow Joe's reputation caused by Wechsler's breaches cannot adequately be compensated by money damages, and it will suffer an irreparable injury if Wechsler is allowed to continue to compete.

110.    The balance of hardships between Snow Joe and Wechsler favors Snow Joe.

111.    Accordingly, the Court should issue an injunction barring Wechsler from competing with Snow Joe in the ice melt business.

112.    The term of the injunction should be for three years from the date of issuance, because Wechsler failed to honor any portion of the three-year non-compete period. The geographical scope of the injunction should be North America.

113.    The public interest would not be disserved by an injunction because, *inter alia*, Snow Joe could supply the ice melt to Home Depot that Northrock (as Blue Mineral) is currently supplying.

**WHEREFORE**, Snow Joe demands Judgment granting the following relief:

A.      On Snow Joe's First Claim for Relief, damages in an amount to be determined at

trial;

B.      On Snow Joe's Second Claim for Relief, damages in an amount to be determined

at trial in the alternative to rescission as sought in the First Amended Answer with

Counterclaims;

C.      On Show Joe's Third Claim for Relief, an injunction for a three-year period barring

Wechsler from competing with Snow Joe in the ice melt business;

D.      Reasonable attorneys' fees to the extent permitted by law;

E.      The costs and disbursements of this action; and

F.      Such other and further relief as deemed just and proper by this Court.

Dated:  New York, New York
        July 2, 2024

                              Yours, etc.,

                              JUDD BURSTEIN, P.C.


                              By:____/s/ Judd Burstein_____
                                      Judd Burstein (JB9585)
                                      Peter B. Schalk (PS8257)
                              110 East 59th Street, 22nd Floor
                              New York, New York 10022
                              (212) 974-2400
                              (212) 974-2944 (Fax)
                              jburstein@burlaw.com
                              pschalk@burlaw.com
                              *Attorneys for Defendant/Counterclaim-*
                              *Plaintiff/Third-Party Plaintiff Snow Joe LLC*
                              *and Defendant/Counterclaim-Plaintiff*
                              *Joseph Cohen*