UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x

NORTHROCK MANAGEMENT LLC,                    24-cv-3155 (JSR)

f/k/a NORTHROCK MINERALS LLC, ORDER

    Plaintiff/Counterclaim-Defendant,

         v.

JOSEPH COHEN and SNOW JOE LLC,
    Defendants/Counterclaim-Plaintiffs,
----------------------------------------x

SNOW JOE LLC,
    Third-Party Plaintiff,

         v.

MOSHE WECHSLER,
    Third-Party Defendant.
----------------------------------------x

<u>OPINION AND ORDER</u>

JED S. RAKOFF, U.S.D.J.

    By a "bottom-line" Order dated December 19, 2024, this Court granted the motion of plaintiff Northrock Management LLC ("Northrock") and third-party defendant Moshe Wechsler ("Moshe") for summary judgment in their favor and against defendants Snow Joe LLC ("Snow Joe") and Joseph Cohen. (Dkt. 60). This Opinion and Order sets forth the reasons for that ruling and directs the entry of final judgment.

**BACKGROUND**

This is a breach of contract action arising from Snow Joe's purchase of Northrock's ice-melt assets pursuant to an Asset Purchase Agreement dated August 3, 2022 (the "APA"), and financed by a series of financial agreements, <u>viz.</u>, a promissory note executed on August 24, 2022 (the "Promissory Note") and a corresponding guaranty executed on the same day, as well as a payment agreement executed on or about November 14, 2022 (the "Payment Agreement") and another guaranty included in the Payment Agreement (collectively, the "financing agreements"). <u>See</u> Joseph Cohen and Snow Joe LLC's Amended Response to Northrock Management LLC, f/k/a Northrock Minerals LLC and Moshe Wechsler's Rule 56.1 Statement of Undisputed Material Facts ¶¶ 1-14 (Dkt. 58) ("ARSUMF").

Following discovery, Northrock moved for summary judgment on their claims arising from the breaches of the financing agreements, <u>see</u> Counts I-IV of the Amended Complaint (Dkt. 14) ("AC"), or, in the alternative, on its account stated claim, <u>see</u> Count V of the AC. In response, defendants chiefly focus on their defenses and counterclaims.[1] The counterclaims chiefly concern (1) Northrock's

---

[1] Defendants raise the following counterclaims: breach of the Non-Compete Agreement, rescission and damages based on fraudulent inducement, breach of the APA, breach of the Payment Agreement, rescission based on breach of contract, breach of the covenant of good faith and fair dealing, and an "injunction barring Northrock from competing with Snow Joe in the ice melt business through its principal Wechsler." <u>See</u> First Amended Answer with Counterclaims to the First Amended Complaint (Dkt. 20).

alleged breaches of the APA by delivering certain assets under the
APA of subpar quality or by delivering them with a delay or not at
all, and (2) the alleged unlawful competition of Moshe,[2] the third-
party defendant to this suit and the owner of Northrock, together
with Northrock's former Direct of Sales, Barry Waschler ("Barry"),
in violation of a non-compete agreement signed by Moshe as part of
the purchase transaction (the "Non-Compete Agreement").

Before addressing the merits of the parties' arguments, the
Court lays out the undisputed key facts and agreements underlying
the alleged breaches at issue in this case.

A. The APA

The key document defining the rights and obligations of the
parties is the APA. Northrock and Snow Joe entered the APA on
August 3, 2022, in connection with Snow Joe's purchase of
Northrock's ice-melt assets for a sum of $8,900,000. Northrock
Management LLC and Moshe Wechsler's Statement of Undisputed
Material Facts (Dkt. 52-1) ("SMF"), Ex. 1 at § 2.4. These assets
included specified inventory, intellectual property, and
commitments to order ice melt from certain stores, including a
commitment from the Home Depot, Inc. for 2022-2023 (the "Home Depot
commitment"). Id. at § 3.14.

---

[2] The Opinion refers to third-party defendant Moshe Wechsler as "Moshe"
to avoid confusion with Barry Wachsler, referred to as "Barry" for the same
reasons, a non-party to this action and Northrock's former employee.

All inventory that Northrock purchased — except for certain 50-pound bags of calcium chloride pellets (the "pellets") and bulk salt (the "salt") that were in transit from a supplier's factories in Egypt — were housed at two sites in New Jersey: one located on 4 American Way in Spotswood and the other on 101 E 2nd Street in Bayonne.[3] In addition to a right to inspect the goods, Section 2.7 of the APA provides that "ALL INVENTORY SHALL BE PURCHASED ON AN 'AS-IS, WHERE-IS' BASIS SUBJECT TO ALL FAULTS AND WITHOUT WARRANTIES OF ANY KIND." Id., at § 2.7. Further, in the same section, Snow Joe "represents and warrants to [Northrock] that, prior to Closing, [Snow Joe] has had the opportunity to inspect, and is satisfied with the condition of, [sic] all Inventory." Id. In accordance with Section 2.7, Snow Joe inspected the quality and condition of all inventory purchased from Northrock and stored in Spotswood and Bayonne. ARSUMF ¶ 25-26.

In addition to the inventory, the APA included a transfer of specified intellectual property, including domain names and trademarks. See id. at Exhibit A ("Form of Domain Name Assignment") & Schedule A; Exhibit B ("Form of Trademark Assignment") & Schedule A; Exhibit G ("List of Social Media Accounts and Domains"); Exhibit H ("List of Additional Intellectual Property").

---

[3] The parties dispute whether "large quantities" of pellets "were left in Bayonne," but that determination is irrelevant to this dispute. See ARSUMF ¶ 27.

B. <u>Financing Agreements</u>

The parties executed a series of financing agreements in connection with the sale of Northrock's ice-melt business. First, on August 24, 2022, Snow Joe executed the Promissory Note in favor of Northrock in the amount of $4,500,000, requiring Snow Joe to pay consecutive monthly payments starting on September 1, 2022, and lasting until March 1, 2024, at which time all obligations under the Note would be paid. SMF, Ex. 2. Shortly thereafter, on August 24, 2022, defendant Cohen also executed a guaranty in favor of Northrock that secured the timely payment of all amounts due by Snow Joe under the Promissory Note. SMF, Ex. 3. Later, on or about November 14, 2022, the parties executed the Payment Agreement wherein Snow Joe agreed to pay Northrock $1,260,661.71 on a weekly payment schedule, beginning on November 21, 2022, and continuing through May 15, 2023, for various additional items, including payroll, rent, and inventory. <u>Id.</u> ¶ 9, Ex. 5.[4]

C. <u>The Alleged Default and the Instant Action</u>

At the beginning of 2023, Snow Joe defaulted on six successive biweekly payments under the Payment Agreement and two successive

---

[4] The parties disagree as to the reason why they executed the Payment Agreement. Plaintiffs claim that it was because Snow Joe owed Northrock money for certain assets that were not included in the Promissory Note. Defendants disagree and refer the Court to a barely comprehensive statement in an accompanying declaration that states that Northrock delayed "Snow Joe's receipt of the Home Depot purchase orders." <u>See</u> ARSUMF ¶ 10; Declaration of Joseph Cohen ¶ 5 (Dkt. 55) (Cohen Decl.).

monthly payments under the Promissory Note. ARSUMF ¶ 15-16. On or about February 14, 2023, Northrock sent defendants a notice of default and a demand for payment under the financing agreements. Id. ¶ 17. While in default, however, Snow Joe continued making partial payments on its debt for almost a year, until January 11, 2024, shortly before plaintiff Northrock initiated a collection lawsuit in a state court in New Jersey on January 26, 2024. Id. ¶ 18; see Dkt. 1 at 10. The action was subsequently removed to a federal court and transferred to the Southern District of New York. See Dkt. 7.

    D. Alleged Breaches of the APA

        1. *Alleged Issues with the Quality and Delivery of the Pellets*

Defendants raise issues regarding the quality of the pellets, at least some of which were shipped from a port in Damietta, Egypt, as well as with the allegedly delayed delivery of those pellets.[5] As to the quality issue, Cohen testified that the pellets and certain branded bags "did not even approach the agreed upon quality standards" but did not recall the quantity or value of the defective inventory or provide any photographic or other evidence of the damage. ARSUMF ¶ 38-39, 41. Further, there is no written evidence that defendants raised any issues with the quality of the

_____

[5] The parties do not dispute that there were no issues with the quality of the salt that arrived from Egypt. ARSUMF ¶ 29.

materials with plaintiffs prior to the commencement of the instant action. Id. ¶ 40.

With regard to the delivery date of the pellets and the salt, while there was no delivery date specified it the APA, it is undisputed that while the materials were en route from Egypt in the fall of 2022, they were, at the request of Snow Joe, re-routed to the Port of Wilmington, Delaware (the "Port"), whereupon they would be released to defendants on a "cash on delivery" basis. Id. ¶¶ 28, 31. The pellets arrived in Wilmington in October of 2022, and some further unspecified quantity of the pellets was provided to the Home Depot several weeks after the arrival. Id. ¶ 34. In August 2023, the port alerted Snow Joe of an auction for the remainder of the materials due to non-payment of invoices. Id. ¶ 35.[6] In September 2023, a year after the asset sale, Snow Joe finally paid the Port almost $700,000 to release the remaining materials, which were then moved to Snow Joe's warehouse. Id. ¶ 36-37.

### 2. Alleged Breach of the Non-Compete Agreement

Several of defendants' counterclaims and affirmative defenses arise from the allegedly "longstanding and far-reaching business interests" between Moshe and Barry, Northrock's former Chief of Sales, that "extend[ed] well beyond ice melt." Defendant's

---

[6] Snow Joe disputes that the auction was due to Snow Joe's non-payment. Id.

Memorandum of Law in Opposition to Motion for Summary Judgement, at 7 (Dkt. 56) ("SMJ Opp.").[7] Specifically, defendants claim that Moshe maintained a very close relationship with Barry throughout and after the sale of Northrock's ice-melt business to defendants, and that together, Moshe and Barry engaged in competition with Snow Joe in violation of the Non-Compete Agreement signed by Moshe on August 24, 2022, as part of that sale. In relevant parts, the agreement prohibited Moshe from contributing with his "knowledge, directly or indirectly . . . to an entity in competition" with Northrock's ice-melt business purchased by Snow Joe. Declaration of Peter B. Schalk, Ex. 153 (Dkt. 54) ("Schalk Decl."). Barry, who had maintained a customer relationship with, _inter alia_, Northrock's customer the Home Depot, did not sign any non-compete agreement. See ARSUMF ¶ 43. Indeed, it was precisely because of Barry's customer relationships that Northrock encouraged Snow Joe to hire Barry, which Snow Joe did not do. Id. ¶ 43-44. It is undisputed that after Northrock had sold the ice-melt assets to defendants, Barry competed with Snow Joe through Blue Mineral Corporation, a New Jersey corporation ("Blue Mineral NJ"), which is controlled by Barry and his sister. Id. ¶ 46. Despite this competition, in the year following the sale of Northrock' s ice-

---

[7] Apart from their shared business interests in the ice-melt market, defendants also allege that Moshe and Barry shared other business ventures. See ARSUMF ¶ 53. Those relationships are irrelevant for the determination of the narrow question of whether Moshe violated the Non-Compete Agreement by engaging in competition with Snow Joe.

melt assets to Snow Joe, in 2023-24, Home Depot awarded Snow Joe more "stores" than it did in 2022-23, even though defendant Cohen testified that Snow Joe "lost the high volume stores." Id. ¶ 49.

Barry was not a novice to the ice-melt business either. Before joining Northrock, Barry had operated his own business in the ice-melt market space. Sometime between 2019 and 2022, however, Barry ran into financial and legal trouble, after which he conveyed the assets and inventory of his ice-melt business and began working for Northrock. Id. ¶¶ 53-68.[8]

### 3. Other Alleged Breaches of the APA

Defendants further argue that plaintiffs materially breached the APA by delivering multiple assets under the APA with a delay, or by failing to deliver or transfer them at all. First, defendants argue that Northrock breached the APA because the pellets that were shipped from Egypt arrived in the United States only in October of 2022, which allegedly caused Snow Joe to be unable to fill the Home Depot commitment and subsequently damaged Snow Joe's relationship with the Home Depot. SMJ Opp. at 11-12.[9] The APA does not specify a date of delivery for the pellets. As to the Home

---

[8] The parties did not specify the exact time and position at which Barry first began working for Northrock.

[9] In their opposition to Northrock's motion for summary judgment, defendants also argue that plaintiffs belatedly provided certain jugs needed to fulfill certain CVS Pharmacy orders, which led to Snow Joe losing that account as well. SMJ Opp. at 12. However, defendants do not argue whether such provisions of jugs were required under the APA or how, if at all, any such delay in delivery of the jugs breached Northrock's obligations. The Court will not piece together claims that a party failed to argue.

Depot commitment, Section 3.14 of the agreement merely recounts that "[t]he following commitment from The Home Depot, Inc. and its affiliates to the Seller . . . is correct and complete." SMF, Ex. 1 at 15. The next page appears to have a cut-and-pasted email order from The Home Depot addressed to Barry, specifying "details of market/ sku awards for 2022-23[.]" Id. at 16. After listing the stores and expected ice-melt material, under a rubric titled "[a] few more specifics," the order summary details in a bullet point that the "load in [sic] arrives in stores in September." Id.

Further, Snow Joe also argues that Northrock materially breached the APA by failing to transfer to defendants a dartsp.com website (the "Dart website") and a Home Depot vendor account number. See ARSUMF ¶ 87-94.

### LEGAL STANDARDS

A court must award summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." SCR Joint Venture L.P. v. Warshawsky, 559 F.3d 133, 137 (2d Cir. 2009) (citation and internal quotation marks omitted). In determining whether there are any genuine issues of material fact, the Court must view all facts in the light most

favorable to the non-moving party, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 286 (2d Cir. 2002).

However, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." <u>F.D.I.C. v. Great Am. Ins. Co.</u>, 607 F.3d 288, 292 (2d Cir. 2010) (citation omitted).

**DISCUSSION**

A. <u>Northrock's Alleged Material Breaches of the APA</u>

Defendants argue that Northrock is not entitled to summary judgment on the breach of contract claims because Northrock itself materially breached the APA agreement in three different ways, concerning: (1) breaches arising from issues with the quality and delivery of the pellets; (2) failure to transfer certain assets; and (3) breach of the Non-Compete Agreement. Each of these arguments fails as a matter of law, and plaintiffs are therefore entitled to summary judgment on their breach of contract claims.

1. <u>The Alleged Quality Issues With and Delayed Delivery of the Pellets</u>

Defendants now argue, for the first time during this litigation, that "a significant portion of the product which Northrock did provide to Snow Joe [was] egregiously substandard and unsellable" and that certain bags were "a garbage dump of materials." SMJ Opp. at 13.[10] Yet defendants, after extensive discovery, have failed to adduce any evidence of a quality issue. Indeed, defendants have failed to identify a single email or other communication in which concerns about the quality of the materials were raised with plaintiffs, or any internal record of the quantity and extent of the alleged damage. Nor do they provide a credible explanation as to why they continued making partial payments on their debt for almost a year despite the alleged issues with the quality of the inventory. Instead, defendants exclusively rely on the oral testimony of defendant Cohen who stated in his deposition that a large amount of the purchased pellets and branded bags "did not even approach the agreed upon quality standards" and one internal email circulated within Snow Joe alleging issues with "a few" unspecified bags of ice melt material. See ARSUMF ¶ 38-41;

---

[10] Neither party addresses with sufficient specificity, and there is no evidence confirming, whether the pellets that were allegedly damaged arrived from the shipment from Egypt or whether they encompassed materials that were also stored in certain warehouses in the United States. For the purposes of this motion, this Court assumes based on representations in defendants' opposition memorandum that both the pellets stored in the warehouses in New Jersey and those that were being shipped from Egypt were of subpar quality. See SMJ Opp. at 13 (discussing the quality of pellets stored in the warehouse and of those that arrived from Egypt).

Schalk Decl., Ex. 3. In that email dated December 15, 2022, an individual named Ikey Nasar of Snow Joe emails several people at Snow Joe including Cohen regarding "Dart stock,"[11] writing that "[i]t was brought to our attention by a few customers that the FB50 (Frost Bite) product they received were completely hardened 'like bricks'" and that "[t]his inventory . . . was provided to us by Dart from last years stock," attaching a photograph of a bag of ice melt of an unidentifiable brand with a hole in the middle. Id. at 2. Nasar then suggests to charge North Rock back for the inventory, to which Paul Riley, the Chief Operating Office of Snow Joe, responds later in the chain, "[l]et me know Q and ELC value so I can hit North Rock with chargeback[.]" Id.[12] There are no emails showing that Snow Joe ever charged Northrock for any substandard product, any documentation quantifying the degree and extent of the damage, or even a single communication with Northrock regarding the issues with the pellets.

What is more, without even as much as mentioning any quality issue in writing to Northrock, Snow Joe continued making payments on its debt for nearly a year. Those payments compensated Northrock

---

[11] The parties' Rule 56.1 statement does not clearly identify the full business name of the "Dart" entity acquired by Northrock. Defendants' Rule 56.1(b) Counter-statement of Material Facts states that "[o]n December 9, 2020, Northrock assumed the names of Dart Seasonal Products and Blue Minerals." ARSUMF ¶ 66. For the purposes of this motion, "Dart" is taken to refer to Northrock.

[12] Neither party addresses the meaning of "Q" and "ELC value," and this Court assumes the abbreviations refer to the quantity and market value of the ice melt in question.

for its assets, including for the pellets, as shown in an email dated December 13, 2023, in which Riley emailed Yoel Goldberg, Emerald Empire Inc.'s Asset Manager, plaintiff's agent, writing "that the $20K from last week and $20K from this week will cover 20% of the $200K that was outstanding. Trust our goal is to get the $200K for the calcium [the pellets] and interest paid down asap" after Northrock allowed Snow Joe to access certain pellets in the Port without payment. See SMF, Ex. 10 (alterations added).

Overall, Cohen's testimony about the subpar quality of the Pellets consists essentially of conclusory allegations that "are insufficient to create a genuine issue of fact." Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003); see also D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir.1998) (at the summary judgment stage, a nonmoving party "must offer some hard evidence showing that its version of the events is not wholly fanciful"). Cohen's allegations are particularly unpersuasive in the absence of any evidence raising with plaintiffs the alleged quality issue with the pellets or any documentation of the extent or seriousness of the damage. Surely, if a "significant portion" of the pellets was "egregiously substandard and unsellable," that issue would have been discussed at least once with Northrock during the year in which Snow Joe continued making payments for these goods. As for the one email referenced above, the fact that defendants did not produce any evidence of ever charging back

Northrock for the "few" unusable bags of pellets — or even mentioning the issue with plaintiffs — demonstrates either that defendants did not believe the matter was material, or that Snow Joe concluded that Northrock was not at fault.

Further still, the record before the Court indicates, if anything, that any quality issues, to the extent they existed, were caused by defendants' own conduct. First, with respect to the pellets shipped from Egypt, defendants admit that after they re-routed the shipment to a different port, they waited for over a year after the purchase of Northrock's assets, i.e. until September of 2023, to pay to release the materials from the Port of Wilmington, which could have negatively impacted the quality of the pellets. ARSUMF ¶ 36. And Moshe also alerted defendants on January 27, 2023, that that the "calcium bulk [in Bayonne was] not tarped" and that is was "going to get hard[,]" recommending that Snow Joe "tarp[s]" the pellets "ASAP." SMF, Ex. 15.

In light of these facts, the Court concludes that "[n]o reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made" by defendants Schmidt v. Tremmel, 1995 WL 6250 (S.D.N.Y. Jan. 6, 1995). Snow Joe's counterclaims and defenses regarding the alleged quality issue with the pellets thus do not create a triable issue of fact.

Independently, Northrock persuasively argues that any issues regarding the quality of the pellets are also precluded by the

plain terms of Section 2.7 the APA ("Inventory Adjustment"), in
which defendants agreed to purchase Northrock's inventory on an
"AS IS, WHERE IS" basis and "SUBJECT TO ALL FAULTS AND WITHOUT
WARRANTIES OF ANY KIND." Id., Ex., Sec. 2.7. The section also
conveys a representation that the "Purchaser has had the
opportunity to inspect [prior to the closing], and is satisfied
with the condition of, [sic] all Inventory." Id. Defendants respond
that the "as is" provision conflicts with Section 3.12
("Inventory"), which states that "[t]he Inventory is un-Encumbered
and is in current, good, saleable and marketable condition."
According to defendants, this section is "incompatible" with Snow
Joe's taking of the inventory "as is," thus creating ambiguity of
which resolution necessitates the admission of extrinsic evidence.
SMJ Opp. at 22-24. That evidence is again the testimony of Cohen
that Snow Joe was assured by Moshe that the quality of the pellets
was "extremely high." Cohen Decl. ¶ 9.

"It is axiomatic that courts construing contracts must give
specific terms and exact terms . . . greater weight than general
language." Cnty. of Suffolk v. Alcorn, 266 F.3d 131, 139 (2d Cir.
2001) (citation and internal quotation marks omitted). Here, the
Court finds that the "as is" clause is more specific than any
general warranties contained in Section 3.12 because the former
not only binds the purchaser to purchase the goods "as is," but
also contains, in essence, a signed declaration that the purchaser

did, in fact, inspect the inventory and was satisfied with the quality. Defendants cannot now argue that the ambiguous warranty of the inventory being "good" and "saleable" not only imposes a specific standard on the quality of pellets but also overrides defendants' own signed statement that they had an opportunity to inspect the goods, that they are satisfied with the quality, and that they agreed to buy them "as is." Nor does the general warranty contained in Section 3.12 contradict the "as is clause" because defendants' did not produce evidence that the title to the inventory was encumbered or not current or that the inventory was not good, saleable, or marketable.

Next, Snow Joe argues that the delivery of the pellets from Egypt was delayed, and the late delivery damaged Snow Joe's relationship with the Home Depot. SMJ Opp. at 11-12. The APA, which is governed by New York law, does not specify a time by which the pellets shipped from Egypt must be delivered to defendants, nor that those pellets must be the specific ones used to fill the Home Depot 2022-2023 order. New York's U.C.C. § 2-309(1) provides, in relevant part, that "[t]he time for shipment or delivery or any other action under a contract if not ... agreed upon shall be a reasonable time." Defendants fail to show any facts creating a material dispute as to whether the delivery time was unreasonable; nor could they, because defendants took control of the pellets shipped from Egypt and re-routed them to the Port in Delaware.

ARSUMF ¶ 28. They cannot now blame plaintiffs for their own actions that were the proximate cause of the delay, especially where there was no delivery date specified in the contract in the first place.

2.   Northrock's Alleged Failure to Transfer Certain Assets

The Court now turns to defendants' argument that Northrock materially breached the APA by failing to transfer a website domain and by delaying the transfer to Snow Joe of a vendor number associated with the Home Depot.[13]

First, defendants allege that Northrock materially breached the APA by failing to transfer the Dart website. See SMJ Opp. at 10. The APA, however, contains a "Domain Name Assignment Agreement," which in "Schedule A" lists the domains that defendants agreed to purchase. ARSUMF, Ex. 1 at 30. The Dart website is not on this list. Clearly, Northrock could not have breached the purchase agreements by failing to turn over a domain that it did not agree to sell.

As to the vendor account number, defendants argue that this number was critical to fill the Home Depot commitment. SMJ Opp. at 8-9. The APA did not, however, require Northrock to transfer its Home Depot number to defendants by its plain text, and defendants do not argue otherwise. In any event, Northrock signed over the

---

[13] The parties do not meaningfully explain what purpose the vendor number serves, and the APA does not address it either.

account by September 8, 2022, not too long after Snow Joe requested
it, which would have given defendants more than sufficient time to
fill the Home Depot orders allegedly due in September of 2022.
ARSUMF, ¶¶ 65-67. Defendants' counter-claims and affirmative
defenses based on these allegations are therefore meritless.

### 3. Alleged Breach of the Non-Compete Agreement

Last, defendants also allege that Moshe and Barry engaged in
a coordinated action to poach Snow Joe's ice-melt customers in
violation of the Non-Compete Agreement. It is undisputed that
Barry, as the former Chief of Sales at Northrock, had cultivated
a relationship with the Home Depot. ARSUMF ¶ 46. It thus surely
did not take defendants by surprise that Barry continued to compete
with Snow Joe after the company purchased Northrock's ice-melt
business, considering that Snow Joe refused to hire him despite
Moshe's recommendation to do so. Id. ¶ 43. Because defendants did
not sign a non-compete agreement with Barry, his conduct would be
actionable only if defendants adduced evidence that Moshe
contributed his "knowledge, directly or indirectly" to Barry's
business enterprise that competed with Snow Joe after Barry's
separation from Northrock. But defendants have failed to produce
such evidence. Instead, they string together suppositions about
Moshe's and Barry's conduct based on nothing more than their joint
business history, which is irrelevant to the determination of

whether Moshe violated the Non-Compete Agreement, and four unpersuasive email communications.

First, defendants argue that Moshe planned to re-enter the ice melt business together based on an email dated September 7, 2022, in which Barry writes, "Wait wait. Why????," upon learning from Moshe that Northrock had decided to shut down its account with "SPS," which was allegedly needed to process Home Depot's electronic ice melt purchase orders. Schalk Decl., Ex. 85.[14] In response, Moshe wrote: "Do you have a cc to put it on to? You can restart it when you are ready[.]" This email is insufficient to establish that Barry had a plan to restart his own ice-melt business, let alone that Moshe in any way planned to partake in it. Further, in the email, Moshe states "you" (Barry) "can" restart the business, which has absolutely no bearing on whether Moshe competed or planned to compete with Snow Joe.

Next, defendants offer an email dated September 16, 2022, in which a former Northrock client forwarded Barry an email from defendants' letting the client know that Snow Joe recently acquired "Dart Season Products," which had been supplying that client. Schalk. Decl., Ex. 119. Moshe then sent that email to Barry, who responded: "I think you should point out that they did not buy the

---

[14] The parties, again, do not even bother to explain the function and general purpose of an SPS account, what the abbreviation generally stands for, or even how it came to Snow Joe's possession. For purposes of this motion, this court assumes, and no party appears to contest, that the SPS account was purchased by Snow Joe from Northrock as part of the APA.

company, just the assets. And they certainly did not buy Dart. I
don't care so much what they said, I just don't want a judge to
say, 'why didn't you contest it what back when[.]'" Id. Defendants'
claim that in this email, "Barry urged Moshe to create an
exculpatory paper trail that could be used in a future litigation
with Snow Joe." ARSUMF ¶ 102. But the email speaks to nothing else
than the undisputed fact that Snow Joe, per the APA, only purchased
Northrock's assets, which included certain Dart assets.

Third, defendants also submit an email dated December 28,
2022, from Barry to a Northrock employee, with Moshe in the cc-
line, stating that "Payments from East River Housing and St. Joseph
Hospital were sent to 777 Chestnut. I don't understand why no one
reached out and asked what it is instead of just depositing it.
Also, someone deleted the East River invoice from the system. Can
you please look into it and have the funds transferred to me . . . ."
Schalk Decl., Ex. 82. Later in the chain, Barry asks Michael Silber
of Northrock to "ask Yahuda to wire to DORT?" Id. The email, does
not, however, in any manner show that the payments received by
Northrock that were to be transferred to Barry were for ice-melt
material or, crucially, that Moshe was in any way implicated in
any ongoing business of Barry's with East River Housing and St.
Joseph's Hospital. Instead, Barry testified that the payments were
advanced by these entities for wholly unrelated chemicals. And
defendants, after extensive discovery that included a review of

Moshe's and Barry's personal email and bank statements, failed to adduce any evidence that the payments were, in fact, related to the sale of the ice-melt business or the alleged violation of the non-compete, or that Moshe was involved in Barry's ongoing business endeavors.

Fourth and last, defendants submit an email from January 19, 2023, with a title "MTA", in which Barry wrote to Moshe and another Northrock employee that "[y]ou'll be getting some huge payments. Please let me know when they come in. We are in the midst of changing address etc, it's a process and all." Schalk Decl., Ex. 83. Later in the chain, Moshe inquires whether Northrock received "checks from the MTA. Totaling over $100k[.]" Id. Considering the email as a whole, including the subject line, the "huge payments" clearly referred to the checks from the Metropolitan Transportation Authority referenced in the title and body of the email. Further, Barry testified that he worked to procure these payments from MTA on behalf of Snow Joe. Northrock's Reply Memorandum of Law in Support of Motion for Summary Judgement, at 3-4 (Dkt. 59); ARSUMF ¶ 104. Defendants nevertheless speculate that "huge payments" refer to something else than the clearly referenced MTA payments. Such conjectures are insufficient to overcome a motion for summary judgment.

4. <u>Effect of the No-Waiver Clause</u>

Northrock argues that by failing to raise the alleged material breaches of contract and by continued payments of its debts, defendants effectively waived their right to raise those material breaches. As defendants point out, however, that argument contradicts the plain language of the "no-waiver" clause of the APA, which states that:

> Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed (a) in the case of an amendment, by Purchaser and Seller and (b) in the case of a waiver, by the Party against whom the waiver is to be effective. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

SMF, Ex.1 at § 6.3. The Payment Agreement contains a similar no-waiver, clause:

> No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

SMF, Ex. 5 at §19. Under New York law, which governs the APA and the Purchase Agreement, no-waiver clauses "are uniformly enforced." Awards.com, LLC v. Kinko's, Inc., 834 N.Y.S.2d 147, 155 (1st Dep't 2007). Accordingly, any waiver of defendants' right under the contract must be in writing, and there was no such written waiver here.

However, defendants' action to continue with the contract, notwithstanding the alleged breach, is not a waiver but an election. ESPN, Inc. v. Office of Comm'r of Baseball, 76 F. Supp. 2d 383, 390 (S.D.N.Y. 1999); see also Bigda v. Fischbach Corp., 849 F. Supp. 895, 901 n.2 (S.D.N.Y. 1994) (finding that "no waiver" clause did not "enable[ ] [party] to continue to perform while reserving his right to sue for breach at some later date" because "the decision of a non-breaching party to continue to perform is not a 'waiver' of that party's right to terminate the contract, but an election, and so the clause is irrelevant" to a dispute about election). "When an executory contract is breached, the non-breaching party to the contract faces two options: he may either continue to perform under the contract or he may terminate the contract." Bigda, 849 F. Supp. at 901. If, as in this case, the "party to an agreement who believes [the agreement] has been breached . . . [but nevertheless] continue[s] to perform the agreement" it may later sue if it notifies the other party of the breach. See Capital Med. Sys. Inc. v. Fuji Med. Sys., U.S.A. Inc.,

658 N.Y.S.2d 475, 478 (3d Dep't 1997); see also Syracuse Orthopedic Specialists, P.C. v. Hootnick, 839 N.Y.S.2d 897, 900 (4th Dep't 2007). Here, defendants elected to continue the contract and did not notify plaintiff of any breach. Snow Joe thus "surrenders his right to terminate later based on that breach." Filmline (Cross-Country) Prods., Inc. v. United Artists Corp., 662 F. Supp. 798, 805 (S.D.N.Y. 1987), aff'd, 865 F.2d 513 (2d Cir. 1989) (citing 5 Williston on Contracts, § 683 at 270 (3d ed. 1961)).

Further, and as discussed supra, the Court also concludes that independently of the no-waiver clause and defendants' partial payments after the occurrences of the alleged breaches, the defendants' affirmative defenses and counterclaims arising from plaintiffs' alleged breaches of contract in connection with the quality of the product, the timing of the delivery, or interference with contract nevertheless fail because defendants do not bring forward any evidence showing that these events indeed occurred.

B. Guaranty Claim

Turning to Cohen's liability under the guaranties, the Court concludes that Northrock is also entitled to summary judgment on this claim. "To prevail on a motion for summary judgment to enforce a guaranty, a creditor must prove an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty." ATX Debt Fund 1, LLC v. Paul, 2024 WL

324780, at *4 (S.D.N.Y. Jan. 29, 2024) (citation omitted). Under the plain text of the guaranty dated August 24, 2022 that secured the Promissory Agreement, Cohen agreed that he "absolutely, unconditionally, and irrevocably guarantees, as surety, the punctual payment and performance, when due, whether at stated maturity, by acceleration, or otherwise, of all present and future obligations, liabilities, covenants, and agreements required to be observed, performed, or paid by the Borrower whether for principal, interest, or otherwise under the Note." SMF, Ex. 3. Then, on or about November 14, 2022, Cohen also agreed that he "personally, absolutely, unconditionally, and irrevocably guarantees, as surety, the punctual payment and performance, when due, whether at the stated payment date, by acceleration, or otherwise, of all present and future obligations, liabilities, covenants, and agreements required to be observed, performed, or paid by Snow Joe under this Agreement, whether principal, interest, late fees or otherwise." Id., Ex. 5. For the reasons stated above, Northrock demonstrates that Snow Joe was liable for the breaches of the Promissory Note and the Payment Agreement. Northrock is, therefore, entitled to summary judgment on the breach of contract claims arising from the two guaranties signed by Cohen in August and November of 2022.

C. <u>Account Stated Claim</u>

"An account stated is 'an agreement between the parties to an account based upon prior transactions between them with respect to the correctness of the separate items composing the account and the balance due, if any, in favor of one party or the other.'" <u>Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff</u>, 638 F. Supp. 714, 719 (S.D.N.Y. 1986) (citation omitted). Northrock moves for summary judgment on the account stated claim in the alternative. <u>See</u> SMJ at 18. Because Northrock can recover for breach of contract, the Court does not need to reach its quasi-contract claim. <u>See</u> <u>Morales v. Grand Cru Assocs.</u>, 759 N.Y.S.2d 890, 891 (2003) ("The existence of an express agreement, whether oral or written, governing a particular subject matter precludes recovery in quasi-contract for events arising out of the same subject matter.").

For the foregoing reasons, the Court grants summary judgment in favor of Northrock and against Snow Joe and Cohen on Counts I through IV in the amount of $6,265,000 plus pre- and post-judgment interest. Correspondingly, defendants' counterclaims and third-party claims are dismissed in their entirety. Clerk to enter final judgment.

SO ORDERED.

Dated:  New York, NY
        April 5/2/ 2025

_____
JED S. RAKOFF, U.S.D.J.